UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF WISCONSIN
_____

2:11-cr-000238
_____

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

SEAN DERAY PATRICK,

*Defendant.*

_____

DEFENDANT'S SENTENCING MEMORANDUM
_____

COMES NOW, the defendant, Sean Deray Patrick, by his attorney, Lew A. Wasserman, and submits herein his Sentencing Memorandum.

On May 4, 2010, Sean Patrick shot and killed Joeren Mason. The incident is related in ¶115 of the Presentence Report (PSR), originally made available to Patrick on January 30, 2012. The facts in ¶115 of the PSR are lifted from the state criminal complaint, 2010CF2423. As relevant to this Memo, the PSR relates the statement (as redacted in the Criminal Complaint) of Tonisha King, who was with Mason at the time of the shooting. Looking at the first full paragraph on page 34 of the PSR, it is not difficult to see why Judge Randa concluded (despite being informed otherwise by Patrick's counsel), that:

-1-

> Second degree recklessly endangering safety (sic). I was on the State bench for 17 years. I know what that is about. It's a matter of proof. But according to the witness, he's sitting in the car. The first shot shatters the window. The next one goes into the right side of his brain. Travels at a leftward angle down and lodges in the left part of his brain. So that's a shooting downwards. That's the angle of the bullet. When I take those facts, that's not recklessly endangering - - reckless homicide. Second degree reckless homicide. That's first degree homicide.

Transcript, Sentencing, 3/29/2012, at 33-34.

Unfortunately, ¶115 misinforms the court - it does not contain critical information that clarifies that Patrick's plea to Second Degree Reckless Homicide was not just a proof problem, or a break given Patrick on the part of a reluctant state court DA. The Criminal Complaint's relation of Tonisha King's observations is taken from an interview given by King to Detective Kent Corbett on May 8, 2010. But ignored in the Complaint (and thus in the PSR), are portions of an earlier interview of King conducted on May 5, 2010, by Detectives Gomez and Gulbrandson (see attached), wherein Ms. King related:

> KING states that at this point of the conversation, the suspect now walked around the front of his car. KING states that she could see that the suspect was holding a gun at his waist pointed sideward. KING states that as the suspect rounded the front of the car, Nathan said, "You gotta a gun fam, you serious." KING describes Nathan as starting to run back to the truck. KING states that as Nathan was running back he said, "Okay, that's what's you on, I got one too." KING states that MASON then ran to the driver side door and opened it.

> KING states that as Nathan ran to the car, she observed that the suspect started running after him. KING states that she observed the suspect running toward their vehicle with his arm extended and the gun in his hand. KING states that she then ducked down into the floor of the front passenger seat. KING states that she then heard the driver's door open. KING states that as the driver's door was opening and as she was ducking down, she heard the sound of 5 shots back to back. KING states that she

saw that MASON was now laying on the floor of the front driver's side, and his feet were outside of the truck. KING states that after the shots stopped, she remained crouched down for a little while.

King's statement to Detectives Gomez and Gulbrandson, clarifies that Mason's declaration to Patrick that he was going to retrieve his gun from his vehicle prompted Patrick to fire at Mason.[1] Moreover, King's statement clarifies that Judge Randa's evaluation of the angle of the shot to the head, while correct anatomically, was inaccurate in it's biomechanical conclusion that Patrick's shot represented an intent to kill, or utter disregard for human life.

Mr. Patrick's criminal history computation, see PSR ¶116, concluded that he should be assessed a subtotal score of 19, with a reduction of one point pursuant to U.S.S.G. §4A1.1©, for a score of 18, placing Mr. Patrick in category VI. However, beginning with ¶102, page 27, it is revealed that 10 of the 19 points were assessed for convictions for Operating After Revocation. Most of these convictions are barely within the 10 year counting period (from the first date of the conduct at issue in this case); some are (also) at the minimum sentence ("at least 30 days") necessary to trigger counting under the guidelines.

An additional 3 points are assessed Mr. Patrick for misdemeanor convictions of Resisting, see ¶108, and for possession of THC, see ¶¶113-14. Another 3 points were assessed for a (now) almost 14 year old conviction for

---

[1] No weapon was found in Mason's vehicle. It is not known whether Mason's threat to get his own gun was merely an attempt to scare off Patrick, or whether some third-party retrieved a gun prior to the police arriving.

Resisting as an Habitual Offender, see ¶109. Indeed, Mr. Patrick's sole prior felony conviction, see ¶115, is that related above - his conviction for Second Degree Reckless Homicide in Milwaukee County Case No. 2010CF2423.[2]

Submitted this 25th day of March 2013.

/s/
_____
Lew A. Wasserman 1019200
Attorney for Sean Deray Patrick

PO Address:
Law Offices of Jean M. Kies, S.C.
135 West Wells Street, Suite 330
Milwaukee, Wisconsin 53203
[414] 272-7622    Office
[414] 272-4744    Fax
attywasserman@wi.rr.com

---

[2] Mr. Patrick has appealed his sentence in this case. See 2012AP1118- CR, Wisconsin Court of Appeals. A review of the briefs filed in his appeal reveals that he has raised two issues: 1) the circuit court relied on inaccurate information concerning Patrick's criminal history; and 2) The circuit court relied on inaccurate information concerning the nature of the underlying crime. The Court of Appeals website indicates that the appeal has been, "submitted on briefs."

# Incident Report
# MILWAUKEE POLICE DEPT

2333 N. 49TH ST

Milwaukee, WI 53210

(414) 935-7502

**101240150**  Supplement No **0012**

Reported Date **05/05/2010**
Nature of Call **HOMICIDE**
Officer **GULBRANDSON, ERIK M**

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101240150 | 0012 | 05/05/2010 | 03:03 | 101242146 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | MURDER, MANSLGHTR/NEGL MANSLGHTR/JUST HOMI |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 2239 W NATIONAL AV | MILWAUKEE | 53204 | 5275 |

| District | Squad | From Date | From Time | Officer |
|---|---|---|---|---|
| 2 | 230 | 05/04/2010 | 20:39 | 009354/GULBRANDSON, ERIK M |

| Assignment | Entered by | Assignment | Confidential |
|---|---|---|---|
| VIOLENT CRIMES DIVISION - EARLY | 006985 | CENTRAL RECORDS DIVISION | HOMICIDE |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 003323 | 05/12/2010 |

Approval Time **08:57:54**
MISC INFO **M4812**

## WITNESS (WITH INFORMATION) 1: KING, TONISHA V

| Involvement | Invl No | Type | Name |
|---|---|---|---|
| WITNESS (WITH INFORMATION) | 1 | INDIVIDUAL | KING, TONISHA V |

| MNI | Race | Sex | DOB | Age | Juvenile? | Res Status | RMS Transfer |
|---|---|---|---|---|---|---|---|
| 2435029 | BLACK | FEMALE | 05/05/1990 | 20 | No | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 3376 N 27TH ST | MILWAUKEE | WISCONSIN |

ZIP Code **53204**

| Phone Type | Phone No |
|---|---|
| CELL | (414)313-4064 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | HOMICIDE |

## Supplement

This report is dictated by **Detective Erik M. GULBRANDSON,** assigned to the Criminal Investigation Bureau, Early Shift, squad 9222.

On Tuesday, 05/5/10, at 9 p.m., myself and **Detective Rudy GOMEZ,** were dispatched to a shooting on 23rd and National.

Upon arrival at this location, we found that the scene to be at the exact location of 2239 W. National Ave. Once there, we met with **Lieutenant Kirsten WEBB** who instructed us to conduct witness interviews. Specifically, Lieutenant WEBB instructed me to conduct the interview of the person believed to be the victim's girlfriend who was identified as Tonisha V. KING. KING was in a marked squad located at the rear of this address in the alley.

With this, I, Detective GULBRANDSON went to the alley behind 2239 W. National Ave. There I met with squad 2250, **PO Francisco CARTAGENA.** PO CARTAGENA had KING in the back of his marked squad car. PO CARTAGENA escorted KING to my unmarked squad where KING sat in the front seat.

Inside the squad, KING identified herself as Tonisha V. KING, B/F, 05/5/90, of 3376 N. 27th St., 313-4064. KING states that she is currently unemployed, but is attending Christian Mills Academy located in downtown Milwaukee and is a senior. KING states that she works the streets occasionally and also dances. KING states that she uses the nicknames of **"Nisha"** or **"Hennessy."** KING states that she has lived at this address for the past 2 1/2 weeks, and lives there with her baby's dad, who she identified **Dennis LEWIS**, B/M, 20. KING states the house

| Report Officer | Printed At | |
|---|---|---|
| 009354/GULBRANDSON, ERIK M | 05/25/2010 19:59 | Page 1 of 5 |

*108*

actually belongs to Dennis' mother who she identified as **Mattie SMITH**, B/F, 37 yoa, also known as Bobby. KING states that also living at this address is her son **Dennis LEWIS III**, as well as Mattie's two other kids **Ciara**, who is a Black female, 17 yoa, and **Rell**, who is a Black male, 18 yoa.

KING states that she knows the victim in this offense as **"J-Bone."** KING states that she does not know much about the victim, but provides the following. KING states that they met about 1 year ago through her cousin who she identifies as Justine POWELL, B/F, 19 yoa. KING states that they met in the area of 20th and Burleigh. KING stated that her and the victim started hanging out, and after about 2 weeks of hanging out, she figured out that the victim was a pimp. KING states that she never worked for the victim, but does admit that she does sometimes works the street and dance at the club usually, "up north." KING states that her and the victim did have a sexual relationship, but their relationship was primarily friendship. KING states that their friendship lasted for about 1 month before they each went their separate ways. KING states that she last saw the victim on November of 2009.

It should be noted that during this investigation the victim was identified as **Joeren A. MASON**, B/M, 12/3/78. Therefore the remainder of the report, the victim will be referred to as **"Mason"**

Regarding today, that being Tuesday, 05/4/10, KING provides the following. KING states that she and her baby's daddy got into an argument. KING states that he kicked her out of the house for the day. KING states that she then went to a friend's house just to hangout. KING states that since Wednesday May 5th is her birthday, she decided that she wanted to go out, but didn't have any money. KING states that she figured that she would come over to National Ave., and walk the streets. KING states the reason that she chose this area was because she used to live on the south side. KING states that her area was going to be from 16th to 27th, National and Greenfield. KING states that she's independent, and that she does not work for anyone. KING states that she charges $50 for oral sex, and $100 for sex, and a $150 for any other sort of "Kinky act."

KING states that she got to this area via bus. KING states that she took the bus from 27th and Keefe and arrived at 27th and National around 4:40 p.m. KING states that during her first loop, she came across two females that were also walking the street. KING described these females as the first a Hispanic female (Puerto Rican) early 20's, 5'4," 160lbs., chunky with big hips and a big chest, light complexion, and light brown hair in the front and dark brown hair in the back. KING states that this subject was wearing a short black dress, light blue bra underneath, and black leggings. KING states the 2nd was a Black female, early to mid 20's, 5'4," 150, thick build, with a "Big booty and big breasts." KING states that she had gold hair in a clip, but could not tell if it was a wig. KING describes her as darker complected, last seen wearing a one piece jean jumpsuit with shorts, a black belt around her waist. It should be noted that I, Detective GULBRANDSON later showed KING booking photo #111013135, **Alandra M. HAYWARD**, B/F, 03/2/92, KING tentatively identified this as the subject that she referred to #1 or the Puerto Rican female. The 2nd photo shown to KING was CJIS #111013134, **Lakeisha WILLIAMS**, B/F, 10/8/81. KING also tentatively identified this as the Black female that was described as subject #2. These photos were shown to KING while at the scene utilizing a crimes program on a laptop computer. King stated that she was not certain that these photos were the same girls but believed that they could be. KING states that when she came across WILLIAMS and HAYWARD, they asked her if she had a "Daddy." KING states that a "Daddy" is a pimp. KING states that she told them that she did have a "Daddy" so they would not bother her. KING states that she does not have a "Daddy".

KING states that once in this area, she walked from 27th to 16th and 16th south to Greenfield, and then 16th west to 27th and 27th back down to National. KING states that she then begin to do that loop again. KING states that during this time, she was approached but never had any tricks. KING states that during the 2nd loop, when she got to Greenfield, she went eastbound instead of west.

KING states that when she was 14th and Greenfield, MASON approached her. KING states that MASON was in a small, 2 door, white car with tint. KING states that MASON yelled to her, "What's happening mama. Come here." KING states that she responded, "I'm on something." KING states that at this point she did not know that it was MASON. KING states that MASON was only yelling out of the cracked open window of this tinted window car. KING states that once she made this remark, Nathan responded, "I know what you on." KING states at this point she then walked up to the passenger side of the car. KING states that she still did not recognize MASON, and MASON did not recognize because she was wearing a wig. KING states that at the time of this interview, she had

| Report Officer | Printed At | |
|---|---|---|
| 009354/GULBRANDSON, ERIK M | 05/25/2010 19:59 | Page 2 of 5 |

already taken the wig off and it should still be in MASON'S vehicle.

KING states that as she was talking to MASON, the car that MASON was in pulled up and then MASON then got out. KING states that as MASON approached her, they recognized each other, but could not remember from where. KING states that after talking for a minute they recognized where it was from, and they talked for a while. KING states that she then went to a store at 12th and Madison to get a pen. KING states that MASON pulled away, but returned a short time later.

KING states that she then got into the car with MASON and the driver. KING describes the driver as a Black male, in his mid 20's, 5'10," 180 skinny build, medium complexion, who she believes to go by the name of **"Ronnie."** KING states that this Ronnie drove them to a the strip mall located at 27th and National.

KING states that once at this strip mall, her and MASON both got out of the car and into MASON'S truck. KING states that once in the truck, her and MASON continued to talk. KING states that MASON offered to buy her some food. KING states that they drove southbound on 27th St., and ended up going to a gas station off of 24th and Greenfield. KING states that she believes this to be a Citgo. KING states that after the gas station, they were then going to go to McDonald's on National Ave. KING states that they were on National driving westbound. KING states that as they got to 22nd St., they saw WILLIAMS and HAYWARD standing on the south/east corner of 22nd and National. KING states that he recognized HAYWARD and WILLIAMS as the same girls she had seen before. KING states that it was obvious that these girls were prostitutes. KING states that MASON made a comment about those girls looking young and new.

KING states that MASON then did a U-turn and pulled up next to these girls. KING states that MASON got out of the car and tried talking to the girls. KING states that MASON was talking "pimp stuff," to these girls. KING states that to her, it appeared as though MASON was trying to get these girls to work for him. KING describes both girls as not saying much to him, but just walking away.

KING states that MASON got back in the truck and they drove to 21st St. KING states that they drove northbound on 21st then turned west to 23rd St. KING states that once they got to 23rd and National, the two girls were now on National. KING states they were in the parking lot of laundry mat. KING states that MASON made a comment about these girls being new, and so he then pulled into the parking lot and parked the truck where it was found during this investigation.

KING states that once the truck was parked, MASON got out of the truck. KING states that both girls went into the laundry mat. KING states that the MASON stood by the passenger window and talked to her as she remained in the vehicle. KING states that MASON made the remark regarding the girls, "Them ain't no vet Ho's, they young." KING states that MASON described the light skinned one as "being in training." KING states that while MASON was outside talking to her, he then got a phone call or made a phone call to another female. KING identified this female as **"China Doll."** KING states that she does not know who this girl is, but she did talk to the girl. KING states that she told China Doll where they were, and China Doll told her that she was on Mineral. KING states that she then gave the phone back to MASON who then continue to talk to this China Doll.

KING states that MASON then walked into the laundry mat in order to start talking to WILLIAMS and HAYWARD. KING states that MASON was in the laundry mat for 3 to 4 minutes talking to WILLIAMS and HAYWARD. KING states that MASON came out by himself and WILLIAMS and HAYWARD both stayed inside. KING states when MASON came out he was still on the phone talking to China Doll. KING states that MASON was talking about how "Inexperienced" these girls were.

KING states that MASON went back to the laundry mat. KING states about 3 minutes later, the girls walked out followed by MASON. KING states that MASON was talking to WILLIAMS. KING states that WILLIAMS was saying, "I'm not on none of that." KING states that MASON continued to talk to the females in the parking lot, and there didn't appear to be any problems. KING states that at one point, she did observe that HAYWARD was on a cell phone, but didn't know who she was talking too.

KING states that 10 minutes after they got out into the parking and were talking, she observed a two tone, dark grey over light grey Chevy Caprice bubble style, with 24 inch chrome rims pull up northbound on S. 23rd St. KING states that this car parked just south of the drive-way off of 23rd St. KING states that there was a driver that she

describes as the suspect and another unknown male subject in the front passenger seat.

KING states that as this car parked, HAYWARD begin walking towards the car. KING states that WILLIAMS then followed and MASON walked with WILLIAMS while approaching the car. KING states that she remained in the truck and was watching them. KING states that she saw that as WILLIAMS, HAYWARD and MASON got closer to the vehicle, a subject exited the driver's door of that vehicle. KING describes this subject who is identified as the suspect as a Black male, 20's to early 30's, 5'7," 150, skinny build, and dark complexion, hair unknown style, last seen wearing a white tee shirt, red baseball hat with either a Milwaukee Brewers glove on front or a LA logo on front, dark jeans, and was armed with a Black semi-auto handgun.

KING stated as the suspect exited the auto, MASON begin talking to the suspect. KING states that MASON and the suspect begin exchanging words. KING states that MASON was calling the suspect out for "His girls being out of pocket." KING described this quote as meaning that the girls that MASON was talking too, should not have been talking to anyone other than their pimp.

KING states that at this point of the conversation, the suspect now walked around the front of his car. KING states that she could see that the suspect was holding a gun at his waist pointed sideward. KING states that as the suspect rounded the front of the car, Nathan said, "You gotta a gun fam, you serious." KING describes Nathan as starting to run back to the truck. KING states that as Nathan was running back he said, "Okay, that's what's you on, I got one too." KING states that MASON then ran to the driver side door and opened it.

KING states that as Nathan ran to the car, she observed that the suspect started running after him. KING states that she observed the suspect running toward their vehicle with his arm extended and the gun in his hand. KING states that she then ducked down into the floor of the front passenger seat. KING states that she then heard the driver's door open. KING states that as the driver's door was opening and as she was ducking down, she heard the sound of 5 shots back to back. KING states that she saw that MASON was now laying on the floor of the front driver's side, and his feet were outside of the truck.

KING states that after the shots stopped, she remained crouched down for a little while. KING states that she then crawled over MASON and out of the driver's door. KING states that she did not realize that MASON had been shot yet. KING states that after crawling out of the vehicle, she then crawled behind the car next to them (to their east). KING states that the passenger of this vehicle then got out and ran into the laundry mat KING states that she ran out with this passenger to the laundry mat as well.

KING states that once in the laundry mat people came inside talking about Mason being shot. KING states that she ran back out to the car. KING states that she grabbed MASON who was still laying on the driver's floor. KING states that she laid MASON on the ground. KING states that she checked for a pulse and there was a faint one. KING states that the victim's phone had fallen out to the ground as she pulled him out. KING states that she then grabbed his phone and dialed 911. KING states that she gave this phone to someone else in order for them to talk to the operator. KING states that she continued to try to keep MASON alert. KING states that Nathan never said anything, but did take a couple of breaths. It should be noted that KING did have blood on both of her forearms. KING states this blood is from MASON, and that she, herself did not sustain any injuries.

During this investigation, KING was wearing a black vest with Rocawear on the back. Underneath the vest was a white tee shirt multi colored front, a short denim skirt with white fish net stockings with stars on them and white tennis shoes with red. KING states that this is what she was wearing throughout the evening.

During the investigation, a potential suspect had been identified. This suspect was identified as **Laraccus A. ROSS**, B/M, 06/9/88. With this potential suspect, **Detective OBREGON** created a photo array which included ROSS. This photo array was assigned #43323. Detective OBREGON brought this photo array to the scene. After receiving this array, I, Detective GULBRANDON reviewed the photo array identification form PC-24. This review was done at 11:20 p.m. KING stated she understood this form and viewed folders 1 thru 8 utilizing the double blind folder method. KING view each of these folders and circled "No" to any of these actors as she believed to be the shooter. KING stated that she would feel better seeing this subject in person.

Also during this investigation, district personnel had stopped a car matching a description of our suspect auto. This car was a 1996 Chevy Caprice with Wisconsin plate 224-RHK. This car was stopped at 1413 W. Grant St.

| Report Officer | Printed At | |
|---|---|---|
| 009354/GULBRANDSON, ERIK M | 05/25/2010 19:59 | Page 4 of 5 |

# Incident Report
## MILWAUKEE POLICE DEPT
### Supplement

101240150  Supplement No 0012

Detective TARVER responded to that scene and will be filing a supplementary regarding that recovery.

With that information, I, Detective GULBRANDSON conveyed KING to that location. KING viewed that car as it was stopped. Upon viewing the car, KING stated that she believed this was the car that she saw the suspect exit and shoot the victim. KING based this identification on the style of the car, the rims on the vehicle, and the two tone paint style. King went on to state that the bottom color of this vehicle was the same, but she believed the top color to be a dark gray instead of black  This viewing of the vehicle took place at 12:05 a.m.

KING stated that she had no further information to provide as it relates to this investigation at this time. KING states that she will continue to cooperate with this investigation.

With this, I, Detective GULBRANDSON conveyed KING back home.

Report dictated by: Detective Erik GULBRANDSON, PS 009354
EG: ddl 05/5/10